# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DOLORES M. ROBINSON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 13 C 1654 |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge Susan E. Cox |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Delores M. Robinson seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA") denying her application for social security disability benefits under the Social Security Act ("the Act"). Ms. Robinson filed a motion for summary judgment, seeking to reverse the Commissioner's final decision or remand the case for further consideration. The Commissioner filed a cross-motion for summary judgment seeking to affirm its final decision. For the reasons set forth below, Ms. Robinson's motion for summary judgment [dkt. 14] is granted and the Commissioner's motion [dkt. 19] is denied. The matter is remanded to the Commissioner for proceedings consistent with this order.

## I.    PROCEDURAL HISTORY

Ms. Robinson applied for disability benefits on August 10, 2010, alleging that she became disabled on July 31, 2010.[1] Her claim was initially denied on November 24, 2010, and again upon reconsideration on March 2, 2011.[2] On April 1, 2011, Ms. Robinson requested a

---

[1] R. at 164–65.
[2] R. at 101, 112.

hearing before an Administrative Law Judge ("ALJ"). A hearing presided over by ALJ Karen Sayon was held on May 7, 2012 in Orland Park, Illinois.[3] Following the hearing, the ALJ issued an unfavorable decision on May 29, 2012, concluding that Ms. Robinson was not disabled under the Act.[4] The Appeals Council denied Ms. Robinson's request to review the ALJ's decision, and thus the ALJ's decision stands as the final decision of the Commissioner.[5] Ms. Robinson filed this action on March 4, 2013.[6]

## II.    FACTUAL BACKGROUND

The facts set forth in this section are derived from the administrative record. Below is a an overview of Ms. Robinson's background and relevant medical history, followed by a summary of the administrative hearing, and the ALJ's decision.

### A.    Employment History

Ms. Robinson was born on August 21, 1955, and was fifty-six at the time of the hearing on May 7, 2012.[7] In her application for benefits, Ms. Robinson reported that she most recently worked as a mentor at a mental health center, from October 2009 until the end of July 2010.[8] Prior to that, she worked as a photographer at a holiday picture photo center during the Easter and Christmas holidays of 2009 and 2010.[9] Ms. Robinson also reported that she worked in food preparation and as a cashier at a restaurant from January 2005 until July 2007.[10] From 1999 to 2002, she held four different jobs, beginning with work as a machine feeder at a cardboard company, a transcriptionist for a hospital, a manager at a seasonal kiosk, and as a cashier at a

---

[3] R. at 55.
[4] R. at 20.
[5] R. at 2.
[6] Dkt.1.
[7] R. at 59.
[8] R. at 208.
[9] *Id.*

nursery.[11]

## B. Medical History

Ms. Robinson suffers from both mental and physical conditions, primarily depression and fibromyalgia.[12] Because Ms. Robinson sees different doctors for each of these conditions, they are discussed separately where possible.

### 1. Mental Health Conditions

The record before the Court contains medical records of Ms. Robinson's depression dating back to 2004, when she sought treatment at Metropolitan Family Services.[13] These records indicate that Ms. Robinson began experiencing symptoms of depression in 1998 and was first hospitalized for psychiatric reasons in 2000.[14] During her hospitalization in 2000, she was diagnosed with major depressive disorder and prescribed Paxil and Prozac.[15] At Metropolitan Family Services, she received therapy from her case manager, Sara Kozera, MHP and received treatment from a series of psychiatrists on a regular basis.[16] The psychiatric progress notes from 2005 to 2010 list major depressive disorder as the ongoing diagnosis.[17] For most of this period, from 2005 to 2008, Ms. Robinson's symptoms were controlled through a daily dosage of 40 milligrams ("mg") of Prozac, and she reported no side effects.[18] In 2008, she reported experiencing muscle pain and decided to switch her depression medication from Prozac to

---

[10] *Id.*
[11] R. at 61–65, 208.
[12] According to the Mayo Clinic guide to diseases and conditions, fibromyalgia is "a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues." *Fibromyalgia: Definition*, MAYO CLINIC, http://www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/definition/con-20019243 (last updated Feb. 20, 2014).
[13] R. at 289, 340.
[14] R. at 290.
[15] *Id.*
[16] R. at 289, 291–339.
[17] R. at 291–339.
[18] *Id.*

Cymbalta to help with the pain.[19] While taking Cymbalta, she initially appeared stable but reported experiencing weekly crying spells during her February 19, 2009 and March 14, 2009 visits, so her dosage was increased to 90 mg.[20] She appeared stable for over a year at this dosage, but in May of 2010, she again reported increased symptoms of depression and her dosage was increased to 120 mg.[21] By September 1, 2010, she reported increased crying spells, appeared distraught, and was diagnosed with severe depression, resulting in her medication being switched back to Prozac.[22]

In November 2010, Ms. Robinson began seeing Morris A. Blount, M.D. at Metropolitan Family Services.[23] At that time, Ms. Robinson reported feeling like herself on Prozac and Dr. Blount found her to be alert, oriented, cooperative, and coherent.[24] She also began seeing Kristine Fox, LCSW, a therapist at Metropolitan Family Services, who found her to be normal, attentive, and within normal limits in the categories of speech, attention, intellectual function, and thought content.[25] In April 2011, Ms. Robinson went to see Dr. Blount and reported that she was not feeling depressed, and was sleeping well at night.[26] In June 2011, Ms. Robinson filled out a "Consumer Review Form" where she stated that she had developed better coping skills and no longer had suicidal thoughts.[27] Finally, in March 2012, Ms. Robinson saw Dr. Blount and reported feeling okay, sleeping well at night, and not feeling depressed.[28]

---

[19] R. at 310. Ms. Robinson's mental health records indicate that she reported pain and decreased energy at several points throughout her treatment. R. at 293–94, 309.
[20] R. at 305–09.
[21] R. at 298.
[22] R. at 294–95, 297–98.
[23] R. at 414.
[24] R. at 414.
[25] R. at 486–94.
[26] R. at 426.

## 2. Physical Health Conditions

For her physical health conditions, Ms. Robinson saw Robert F. Boll, D.O. every three to six months and Cathy Moynihan, a nurse practitioner, every three months.[29] The record contains five physical exam forms from August 2009 to January 2011, each signed by nurse Moynihan.[30] According to these records, on August 25, 2009, Ms. Robinson did not exhibit any physical abnormalities, but reported that she was "crying all the time" while on 60 mg of Cymbalta.[31] On January 26, 2010, Ms. Robinson returned to see nurse Moynihan for a checkup and described her fibromyalgia as "really bad."[32] At her July 19, 2010 visit, Ms. Robinson reported that her glands were bothering her and she appeared to have swollen lymph nodes.[33] On September 1, 2010, Ms. Robinson appeared to have a callus-like structure on her toe.[34] Nurse Moynihan sent her to have a foot x-ray, which revealed a "mild hallux valgus and degenerative changes in the first metatarsophalangeal joint" with no other "significant radiographic abnormalities."[35] On January 26, 2011, Ms. Robinson complained of increased fibromyalgia pain and noted that Cymbalta helped with the pain but also caused increased anxiety and confusion.[36]

In between her July and January visits with nurse Moynihan, Ms. Robinson saw a podiatrist at John Stroger Hospital on October 14, 2010. She described feeling pain in her right toe due to a bunion and indicated that the pain had increased over the past four years.[37] The podiatrist recommended purchasing a "rocker shoe" and suggested that surgery might be

---

[27] R. at 434.
[28] R. at 473.
[29] R. at 69.
[30] R. at 257–60.
[31] R. at 260.
[32] R. at 259.
[33] R. at 258.
[34] R. at 257.
[35] R. at 257, 506.

necessary in the future.[38]

There are no records of Ms. Robinson's physical condition again until April 2012. At that time, she saw Maya Karam, a nurse practitioner, to get her cholesterol prescription refilled and to discuss the pain in her upper extremities.[39] Ms. Robinson reported that she walked a few times a week and was not feeling depressed.[40] Nurse Karam noted that Ms. Robinson "ambulates without difficulty, [is] alert, [and] in no acute distress."[41]

### 3. Disability Application Records

The following medical examinations and reports were completed for Ms. Robinson's disability application. On November 10, 2010, Ms. Robinson underwent a psychiatric evaluation with Herman P. Langner, M.D.[42] Ms. Robinson reported that she was chronically sad, cried easily, felt fatigued, spent much of her time in bed, had memory problems, and sometimes heard whispers.[43] Dr. Langner found this information to be reliable.[44] He noted that her affect was flat, her posture and gait were unremarkable, and ultimately rated her global assessment of functioning ("GAF") at 45.[45] On November 19, 2010, psychiatrist Michael J. Schneider, Ph.D. evaluated Ms. Robinson. He noted "mild" limitations in her daily activities, her ability to maintain social functioning, and her ability to maintain concentration, persistence, or pace.[46]

On November 10, 2010, Ms. Robinson also met with and was examined by Mahesh Shah,

---

[36] R. at 393.
[37] R. at 354.
[38] Id.
[39] R. at 497.
[40] Id.
[41] Id.
[42] R. at 359–61.
[43] R. at 339.
[44] Id.
[45] R. at 359–61.
[46] R. at 378.

M.D.[47] Ms. Robinson reported pain all over her body including her arms, legs, and back. She explained that the pain in her legs was progressively getting worse and that she had to lie down and rest at home for a couple of hours at the end of the day.[48] Dr. Shah observed that Ms. Robinson was able to move around the office without assistance and was able to get on and off the examining table without issue.[49] He concluded that the "examination was fairly unremarkable" other than the pain in Ms. Robinson's right big toe and noted that Ms. Robinson could not walk on her toes because of the pain.[50]

On January 27, 2011, Ms. Robinson's treating psychiatrist, Dr. Blount, filled out a medical statement titled "Ability to do Work-Related Activities (Mental)" for her disability application.[51] He checked off boxes evaluating Ms. Robinson's ability to carry out various activities using the categories "excellent," "good," "fair," or "poor."[52] Under this system, "excellent" indicated that the ability was not limited. "Good" was defined as "the individual can perform the activity satisfactorily most of the time." "Fair" meant that "the individual can perform the activity satisfactorily some of the time." "Poor" meant no useful ability to function.[53] Ms. Robinson fell into the "fair" category for the following activities: understanding, remembering and carrying out detailed instructions; maintaining attention and concentration for extended periods; accepting instructions and responding appropriately to criticism by supervisors; and responding appropriately to changes in the work setting.[54]

On January 26, 2011, nurse Moynihan completed and signed a form titled "Ability to do

---

[47] R. at 363.
[48] *Id.*
[49] R. at 364.
[50] R. at 366.
[51] R. at 409–10.
[52] *Id.*
[53] *Id.*

Work-Related Activities (Physical)," which Ms. Robinson's treating physician, Dr. Boll, later signed on May 4, 2012.[55] The form indicated that Ms. Robinson could occasionally and frequently lift or carry 10 pounds, and could stand or walk for at least two hours in an eight-hour workday.[56] The form also indicated that Ms. Robinson's impairments did not affect her ability to sit, but that pushing and pulling were both limited by Ms. Robinson's fibromyalgia.[57]

### C.    The Hearing Before the ALJ

On May 7, 2012, in Orland Park, Illinois, the ALJ conducted a hearing regarding Ms. Robinson's disability claim.[58] Ms. Robinson appeared in person and was represented by attorney John Horn.[59] The ALJ heard testimony from Ms. Robinson and vocational expert ("VE") Ruben Luna.

### 1.    Ms. Robinson's Testimony

Ms. Robinson testified that she was born on August 21, 1955 and that she is a high school graduate.[60] She stated that she and her husband live with her brother-in-law.[61] Ms. Robinson testified that she has a driver's license, but sometimes has problems driving when she is overly anxious.[62] She stated that she does not currently have an income and has not worked since July 2010.[63]

The ALJ then discussed Ms. Robinson's work history, beginning with her job as a transcriptionist for a hospital in the late nineties, and then as a manager at a kiosk for a season,

---

[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] R. at 55.
[59] *Id.*
[60] R. at 59–60.
[61] *Id.*
[62] R. at 60.

and as a cashier at a plant nursery.[64] Ms. Robinson testified that the jobs at the nursery and the kiosk involved lifting 20 pounds.[65] She testified that she subsequently worked at a bagel company in 2005 and 2006 doing food preparation and running the cash register, which required her to lift between 25 and 50 pounds.[66] Ms. Robinson then described working at a cardboard manufacturer feeding cardboard into machines in the late nineties, a position that she held for less than a year because it required a lot of physical activity.[67] At the hearing, the ALJ stated that Ms. Robinson's two most recent jobs as a mentor at a mental health center and a photographer at a seasonal photography company would not be discussed because they did not qualify as substantial gainful activity.[68]

The ALJ then asked Ms. Robinson about her medical history.[69] Ms. Robinson testified that she stopped working in July 2010 and felt she could not continue working because of the pain involved in doing simple everyday things.[70] Ms. Robinson testified that she suffers from fibromyalgia and needs help with any task that requires her to get on a ladder because she loses her balance.[71] She testified that she needs help with anything that requires a hard grip, because she does not have a very good grasp.[72] She noted that she takes amitriptyline for her fibromyalgia pain every night, as well as magnesium-oxide, magnesium, and vitamin D.[73] Ms. Robinson testified that she sees Dr. Boll once every three to six months and was seeing nurse

---

[63] R. at 61.
[64] R. at 63, 83.
[65] R. at 63.
[66] R. at 64.
[67] R. at 64–65.
[68] R. at 67.
[69] *Id.*
[70] *Id.*
[71] R. at 68.
[72] *Id.*
[73] R. at 68–69.

Moynihan every three months.[74] Nurse Moynihan recommended that Ms. Robinson treat her fibromyalgia by walking, which she does about twice a week.[75] The fibromyalgia especially affects Ms. Robinson's knees and shoulder area.[76] Ms. Robinson testified that she can stand for about an hour at a time, walk about a block and a half, and sit for about an hour.[77] Ms. Robinson stated that she needs to use both hands to carry a gallon of milk and that she cannot carry it for very long.[78] Ms. Robinson testified that she cannot carry anything heavier than a gallon of milk and has been unable to do so for the last five years.[79]

The ALJ then asked Ms. Robinson about her depression. Ms. Robinson testified that it causes her to cry, sometimes for days, without any real reason, and affects her ability to concentrate, making her very tired so that she has to lie down frequently.[80] She said that she has these crying spells about twice a month.[81] There are days when her depression does not allow her to get out of bed, sometimes for more than one day at a time, probably once or twice a month.[82] This has been happening since 1998 or 1999.[83] Ms. Robinson testified that she takes 80 mg of Prozac for depression, 50 mg of Trazadone to help her sleep, and Lorazepam.[84] Ms. Robinson testified that some of the side effects she experiences from her medications are fatigue, memory loss, and frequent urination.[85]

To treat her depression, Ms. Robinson testified that she sees Dr. Blount every three

---

[74] Id.
[75] Id.
[76] R. at 70.
[77] Id.
[78] Id.
[79] R. at 83.
[80] R. at 71.
[81] R. at 80.
[82] R. at 77–78.
[83] R. at 79.
[84] R. at 71.
[85] R. at 74.

months, attends group therapy, and sees a therapist.[86] Ms. Robinson testified that she attends two different one-hour group therapy sessions every week.[87]

The ALJ asked Ms. Robinson to describe a typical day. She testified that she wakes up and has coffee and toast.[88] On a typical day, she sits in the front room and watches a movie.[89] After sitting for a while, she might do some dishes and then sit down for another cup of coffee.[90] Ms. Robinson typically takes a nap every day around 2:00 p.m. or 3:00 p.m. for two to three hours and has been doing so for six months to a year.[91] Ms. Robinson also testified that she rests for nearly half the day, sitting or lying down every couple of hours for about thirty minutes at a time.[92] Ms. Robinson puts her feet up because she has a problem with the knuckle in her right foot and it helps with her fibromyalgia.[93] Ms. Robinson testified that she saw a podiatrist at John Stroger Hospital, who told her that she has a growth over her big toe and recommended she wear special shoes.

Ms. Robinson testified that she can do some household chores, such as: doing laundry, straightening up, and cleaning the bathroom.[94] She testified that she cannot do the grocery shopping on her own because she cannot put the bags in her car or carry them into her home.[95] Ms. Robinson stated that she enjoys gardening, but has had to garden in pots instead of her flowerbed because she cannot get down to the ground or get up.[96] She recently planted six

---

[86] R. at 72–73.
[87] R. at 74.
[88] R. at 75.
[89] *Id.*
[90] *Id.*
[91] R. at 75, 83.
[92] R. at 80.
[93] R. at 81.
[94] R. at 76.
[95] *Id.*
[96] R. at 76.

tomato plants in buckets, which took her an entire day.[97] Ms. Robinson testified that she sees her friends once a week to bake or do crafting, and talks to them on the phone a few times a week.[98]

Ms. Robinson ended her testimony with some questions from her attorney, Mr. Horn.[99] She testified that in an eight-hour workday, she could be on her feet for no more than two hours.[100] Ms. Robinson stated that she is unable to work as a transcriptionist because of her poor memory, concentration, and focus, as well as the pain in her wrists.[101] She stated that she has to pause a movie about five times while watching it, for a period of about ten minutes, because she loses concentration and cannot sit still for very long.[102]

## 2.    The Vocational Expert's Testimony

The VE, Ruben Luna, testified next.[103] He found that all of Ms. Robinson's past work experience varied from skilled and sedentary to semi-skilled and medium work.[104] The ALJ asked the VE if an individual of Ms. Robinson's same age, education, and vocational background would qualify for any of Ms. Robinson's previous positions if that person had similar mental restrictions, was restricted to medium work involving carrying twenty-five pounds frequently and fifty pounds occasionally, and could stand or walk about six hours in an eight hour workday.[105] The VE responded that the hypothetical person would only be able to do the job of feeding cardboard into machines, because all of Ms. Robinson's other past work was

---

[97] R. at 82.
[98] R. at 77.
[99] R. at 78.
[100] R. at 84.
[101] *Id.*
[102] R. at 84–85.
[103] R. at 86.
[104] *Id.*
[105] R. at 88.

either skilled or semi-skilled.[106]

The VE identified three other unskilled and medium jobs that the hypothetical person would qualify for: laundry laborer, packaging machine operator, and industrial sweeper cleaner.[107] When the ALJ proposed the additional limitation of no production rate work, meaning goal-oriented work that can be spread out throughout the day, the VE testified that only the industrial sweeper cleaner job would qualify and that no other medium jobs would meet that description.[108] The VE confirmed that an employer would not tolerate a daily two-hour nap during the workday, nor elevating one's legs to waist level for fifty percent of the day.[109] The VE said that missing work three days a month and being off task for thirty percent of the time would also be unacceptable.[110]

On cross-examination, the VE testified that a person could be off task for a maximum of ten minutes in an hour, or sixteen to seventeen percent of the time.[111] He also testified that employers generally allow a person to be absent only one day a month.[112] The VE agreed that a person who misses two to three days of work each month, is off-task more than seventeen percent of the time, and can stand only two out of six hours, would be limited to sedentary work.[113]

### D.    The ALJ's Decision

In an opinion dated May 29, 2012, the ALJ concluded that Ms. Robinson was not disabled within the meaning of the Act at any time after her alleged onset date of July 31,

---

[106] R. at 88–89.
[107] R. at 89.
[108] R. at 90–91.
[109] *Id.*
[110] R. at 91–92.
[111] R. at 92.
[112] R. at 93.

2010.[114] SSA regulations prescribe a sequential five-step evaluation process for determining whether a claimant is disabled.[115] At the first step, the ALJ determined that Ms. Robinson did not engage in substantial gainful activity since the alleged onset date.[116]

At step two, the ALJ determined that Ms. Robinson had the following severe impairments: fibromyalgia, obesity, and major depressive disorder.[117] However, the ALJ concluded that Ms. Robinson's hypertension, high cholesterol, and bunion were non-severe impairments.[118]

At the third step, the ALJ determined that Ms. Robinson did not have any impairment or combination of impairments that met the severity of those listed in the regulations, under 20 C.F.R. Part 404, Subpart P, Appendix 1.[119] There is no listing specified for fibromyalgia or obesity, and the ALJ concluded that Ms. Robinson's mental impairment did not meet or medically equal the criteria of listing 12.00, paragraph B or paragraph C.[120] Specifically, the ALJ found that Ms. Robinson had mild restrictions in activities of daily living and social functioning, moderate difficulties maintaining concentration, persistence, or pace, and no episodes of decompensation for an extended duration.[121]

The ALJ concluded at step four that Ms. Robinson had the residual functional capacity ("RFC") to lift and carry twenty-five pounds frequently and fifty pounds occasionally; stand or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour work day;

---

[113] *Id.*
[114] R. at 20–31.
[115] 20 C.F.R. § 404.1520(a)(1).
[116] R. at 22.
[117] *Id.*
[118] *Id.*
[119] R. at 23.
[120] *Id.*
[121] *Id.*

follow simple instructions; perform routine tasks; adjust to occasional changes in the work setting; and make simple work-related decisions.[122] The ALJ also found that Ms. Robinson's allegations of disabling limitations were "not credible."[123]

In assessing Ms. Robinson's credibility, the ALJ noted that Ms. Robinson received regular treatment for her mental impairments, and that the treatment notes indicated her depression was generally stable and contained minimal complaints of memory problems and fatigue.[124] The ALJ also noted that Ms. Robinson's history of depression is longstanding, with evidence of good past work attendance and performance at her previous jobs and no evidence that her condition had worsened since the alleged onset date.[125] In Ms. Robinson's favor, the ALJ agreed with the assessment of Ms. Robinson's treating psychiatrist, Dr. Blount, as to Ms. Robinson's mental abilities, finding moderate limitations in concentration, persistence, or pace. The ALJ also noted that Ms. Robinson received a consultative examination GAF score of 45.[126]

As for Ms. Robinson's fibromyalgia, the ALJ found her physical impairments to be severe, but found that her reported activities of daily living—visiting with friends, gardening, going for walks, running errands, driving her brother around, and sewing—were "generally inconsistent with her allegations of disabling limitations."[127] The ALJ also noted that Ms. Robinson received limited treatment for fibromyalgia and the findings on examination were generally within normal limits.[128] As a result, the ALJ concluded that Ms. Robinson was limited

---

[122] R. at 25.
[123] Id.
[124] R. at 27–28.
[125] R. at 27.
[126] R. at 27–28.
[127] R. at 28.
[128] Id.

to a range of medium exertional work.[129]

Turning to the opinion evidence, the ALJ gave little weight to the "Ability to do Work-Related Activities (Physical)" form completed by nurse Moynihan and later signed by Ms. Robinson's treating physician, Dr. Boll, on May 4, 2012.[130] The ALJ noted that their findings were based on Ms. Robinson's subjective allegations, which were "not consistent with or supported by treatment notes" and that Dr. Boll merely signed the form without explanation.[131] However, the ALJ did rely on the opinion of Ms. Robinson's treating psychiatrist, Dr. Blount, who assessed Ms. Robinson's mental abilities and areas as "fair" functioning on a form titled "Ability to do Work-Related Activities (Mental)."[132] She stated that she accommodated for these limitations by restricting Ms. Robinson to simple, routine type work with only occasional changes in work setting, thus limiting Ms. Robinson to a range of medium work.[133]

At step five, the ALJ determined that Ms. Robinson was able to perform her past relevant work as a carton machine feeder—a medium and unskilled job, as well as other jobs existing in the national economy.[134] The ALJ reasoned that according to the VE's testimony, even with Ms. Robinson's additional limitations on medium work, she would be capable of performing the requirements of such additional occupations as laundry laborer, packaging machine operator, and industrial sweeper/cleaner.[135]

## III.  STANDARD OF REVIEW

The Court's review is limited to an inquiry into whether there is substantial evidence to

---

[129] *Id.*
[130] R. at 29
[131] *Id.*
[132] *Id.*
[133] *Id.*
[134] R. at 30.
[135] R. at 31.

support the ALJ's findings and whether the correct legal standards were applied.[136] Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.[137] The standard of review is deferential, but the reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision.[138] Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the Commissioner and not the court.[139] Although the ALJ need not address every piece of evidence or testimony presented, she must adequately discuss the issues and build a logical bridge from the evidence to her conclusions.[140] The court will conduct a critical review of the evidence and will not uphold the ALJ's decision if it lacks evidentiary support or if the Commissioner applied an erroneous legal standard.[141]

## IV.    ANALYSIS

Ms. Robinson proffers two principal arguments for remand: (1) the ALJ improperly evaluated Ms. Robinson's credibility by failing to consider her testimony about the need to elevate her feet and the fatigue caused by her medications; and (2) the ALJ inaccurately assessed Ms. Robinson's RFC by misreading the opinion of her treating psychiatrist, Dr. Blount.

### A.    The ALJ's Credibility Determination

The ALJ classified Ms. Robinson's depression and fibromyalgia as "severe impairments," but ultimately determined that Ms. Robinson's testimony about these disabling

---

[136] 42. U.S.C. § 405(g).
[137] *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (citing *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009)).
[138] *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008).
[139] *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990) (citing *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).
[140] *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).
[141] *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

limitations was "not credible."[142] Ms. Robinson argues that this credibility assessment was erroneous because the ALJ: (1) failed to consider her need to elevate her feet and (2) ignored her testimony that her medications caused fatigue. Ms. Robinson further argues that this erroneous credibility determination also led to an erroneous RFC determination. The Commissioner argues that the ALJ considered Ms. Robinson's foot pain and fatigue and that any omissions were harmless error.

In general, an ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."[143] The regulations require the ALJ to consider all allegations of physical and mental limitations or restrictions, including the claimant's own assessment of his or her abilities.[144] Although a written evaluation of each piece of evidence or testimony is not required, the ALJ must not select and discuss only the evidence that favors her ultimate conclusion.[145] Reviewing the record with these principles in mind, the Court finds that the ALJ's credibility determination failed to address Ms. Robinson's need to elevate her legs and did not sufficiently explain why she discredited Ms. Robinson's allegations of fatigue.

### 1. Ms. Robinson's Need to Elevate Her Legs

At the hearing, Ms. Robinson testified that she needed to elevate her legs for nearly half

---

[142] R. at 25, 29.
[143] *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003).
[144] SSR 96-8p; 20 C.F.R. § 404.1545(a).
[145] *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir. 1985).

the day because she has a bunion and it helps with her fibromyalgia.[146] This testimony is the only evidence in the record about Ms. Robinson's need to keep her legs elevated, and both sides agree that the ALJ did not explicitly discuss this claim. Rather, the parties disagree over the significance of the omission. Ms. Robinson argues that the ALJ's failure to consider this testimony in her credibility determination is significant because the need to elevate one's feet for half the day would preclude work, according to the VE.[147] The Commissioner argues that the omission was harmless because the ALJ considered Ms. Robinson's bunion and ultimately determined that it was not a severe impairment.[148]

When an ALJ denies benefits, the ALJ must "build an accurate and logical bridge between the evidence and [her] conclusion."[149] Although it is within the ALJ's power to decide, whether the need to elevate one's legs is a limitation, the ALJ is obligated to explain her conclusion.[150] Moreover, when the claimed disability is fibromyalgia, a claimant's testimony is particularly important, since fibromyalgia is an elusive diagnosis with symptoms that may be entirely subjective.[151] The Seventh Circuit has recognized that the amount of pain and fatigue caused by fibromyalgia remains completely subjective.[152]

Ms. Robinson relies on two recent Seventh Circuit cases to support her claim that the omission is grounds for remand. In *Smith v. Astrue*, the Seventh Circuit remanded in part because

[146] R. at 81–82.
[147] R. at 91–93.
[148] R. at 22.
[149] *Zurawski*, 245 F. 3d 881, 887 (7th Cir. 2001).
[150] *Earls v. Barnhart*, 54 F. App'x 239, 240 (7th Cir. 2002) (holding that the record did not contain any evidence that it was essential for the plaintiff to elevate his feet and therefore, absent medical evidence to the contrary, the ALJ had the right to decide whether it was an essential requirement).
[151] *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996).
[152] *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 916 (7th Cir. 2003).

the ALJ failed to explain why she did not believe the claimant needed to elevate her leg.[153] The plaintiff in *Smith* had a condition that caused persistent swelling in her leg and testified that she spent most of the day with her leg elevated to keep the swelling and pain under control.[154] In that case, as here, the ALJ found the claimant's testimony not credible, and summarily concluded that the claimant did not need to elevate her leg despite evidence in the record to the contrary.[155] Given the perfunctory nature of the ALJ's discussion, the Seventh Circuit concluded that the ALJ had failed to build a "logical bridge" between the record and her credibility determination.[156]

In *Chase v. Astrue*, a similar case, the Seventh Circuit remanded when it determined that the ALJ had reached an improper medical conclusion about the level of foot elevation required by the plaintiff.[157] The court held that the case must be remanded because the ALJ gave no reason for disregarding the claimant's testimony that he needed to significantly elevate his right leg at home.[158]

In the instant case, the ALJ not only failed to explain why she did not believe the claimant's testimony regarding leg elevation, but failed to address the issue. Ms. Robinson provided two reasons for elevating her legs—bunion pain and fibromyalgia pain. The ALJ's separate finding that Ms. Robinson's bunion was not a severe impairment did not by implication address Ms. Robinson's alleged need to elevate her legs due to fibromyalgia, which was deemed a severe impairment. This omission is particularly important because the VE testified that the

---

[153] *Smith v. Astrue*, 467 F. App'x. 507, 510 (7th Cir. 2012).
[154] *Id.*
[155] *Id.*
[156] *Id.*
[157] *Chase v. Astrue*, 458 F. App'x 553 (7th Cir 2012).
[158] *Id.* at *5.

need to elevate one's legs for half the workday would preclude work.[159] The ALJ gave no reason for disregarding Ms. Robinson's testimony on this point and failed to explain why it was not credible. In so doing, she left an impermissible gap between the evidence and her credibility determination. The Court therefore finds that the ALJ erred by failing to consider Ms. Robinson's need to elevate her legs.

### 2. Ms. Robinson's Allegations of Fatigue

Ms. Robinson also argues that the ALJ improperly evaluated her credibility by failing to consider the fatigue caused by her medications. The Commissioner concedes that the ALJ did not specifically address medication-induced fatigue, but argues that the omission is harmless because the ALJ sufficiently considered Ms. Robinson's general fatigue and found it not credible. At the hearing, Ms. Robinson testified that some of her medications make her tired.[160] The ALJ did not specifically address this claim of medication-induced fatigue but did discuss fatigue generally. In her decision, the ALJ noted that Ms. Robinson "sleeps for about 4 to 5 hours after a long period of sitting, standing, or walking," "lays down most of the day," and "falls asleep a lot."[161]

Ms. Robinson's argument relies on SSR 96-7p and its requirement that an ALJ consider the side effects from a claimant's medications in assessing credibility. The ALJ must consider, the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms."[162] An ALJ is not required to address every piece of evidence or testimony presented in her decision, but must build an accurate and logical bridge

---

[159] R. 91–93.
[160] R. at 74.
[161] R. at 25.
[162] SSR 96-7p; *see also* 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv).

between the evidence and her conclusions.[163]

After considering Ms. Robinson's testimony on fatigue, the ALJ ultimately determined that Ms. Robinson's reported activities of daily living—visiting with friends, gardening, going for walks, running errands, driving her brother around, and sewing—were "generally inconsistent" with her allegations of fatigue.[164] However, the ALJ failed to explain why she concluded these daily activities were inconsistent with Ms. Robinson's allegations of fatigue. The Seventh Circuit has specifically "cautioned against placing undue weight on a claimant's household or outdoor activities."[165] It has also pointed out "the naiveté of the Social Security Administration's administrative law judges in equating household chores to employment"[166] and has "repeatedly cautioned that a person's ability to perform daily activities, especially if [they] can be done only with significant limitations, does not necessarily translate into an ability to work full-time."[167] Under this reasoning, it was improper for the ALJ to use Ms. Robinson's reports of daily activities to completely discredit her allegations of fatigue without providing a rationale for doing so.

The Court also notes that the errors in the ALJ's credibility determination may also affect the ALJ's ultimate conclusion in her RFC analysis that Ms. Robinson is capable of medium exertional work and a six-hour workday. The Court therefore remands for further assessment of Ms. Robinson's credibility in light of her need to elevate her feet and her testimony regarding

---

[163] *See Jones*, 623 F.3d at 1160.

[164] R. at 25, 28.

[165] *Day v. Astrue*, 334 F. App'x 1, 8 (7th Cir. 2009).

[166] *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013) (quoting *Bjornson v. Astrue,* 671 F.3d 640, 647 (7th Cir.2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons (... [her] husband and other family members), and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.")).

fatigue, and for reconsideration of Ms. Robinson's RFC to the extent it is impacted by the ALJ's credibility determination.

### B.    The ALJ's RFC Mental Assessment Analysis

Ms. Robinson argues that the ALJ incorrectly assessed her RFC by misreading the opinion of her treating psychiatrist, Dr. Blount. In assessing Ms. Robinson's mental abilities on a form titled "Ability to do Work-Related Activities (Mental)" on January 27, 2011, Dr. Blount opined that Ms. Robinson had a "fair" ability to (1) understand, remember, and carry out detailed instructions; (2) maintain concentration and attention for extended periods; and (3) adjust to workplace changes.[168] Ms. Robinson contends that the ALJ misinterpreted "fair" to mean that her condition was "moderate" instead of "marked," and that she therefore would not be off task for more than sixteen or seventeen percent of the time. This is significant because the VE testified that there is no work for anyone off task more than sixteen or seventeen percent of the time.[169] In response, the Commissioner argues that the ALJ reasonably accounted for the limitations assessed by Dr. Blount.

The Court agrees with the Commissioner that the ALJ's RFC determination reasonably considered Dr. Blount's medical assessment and provided adequate accommodations in light of his opinion. An ALJ is required to "build an accurate and logical bridge between the evidence and [her] conclusion."[170] Here, the ALJ concluded, based on her interpretation of Dr. Blount's assessment as well as other evidence, that Ms. Robinson was restricted to work involving simple instructions, routine tasks, and only occasional changes in the work setting.[171] She explained that

---

[167] *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013).
[168] R. at 409–10.
[169] R. at 92.
[170] *Zurawski*, 245 F.3d at 887.
[171] R. at 28.

she made these accommodations based on Dr. Blount's finding that Ms. Robinson had a "fair" ability to perform certain tasks.[172] Ms. Robinson contends that a "fair" ability equates to being off task more than sixteen or seventeen percent of the time, which would preclude work. However, the record lacks support for this contention. The form itself defines "fair" as capable of performing the activity "satisfactorily some of the time."[173] Applying this definition, the ALJ explained, for example, that she accommodated for Ms. Robinson's "fair" ability to maintain concentration for extended periods by limiting her work to simple instructions and routine tasks.[174] The ALJ explained that she also considered other examiners' notes in the record, which assessed Ms. Robinson's concentration and attention at normal levels.[175] The ALJ thus provided the requisite logical bridge by explaining how she reached her conclusions. Therefore, the Court finds that the ALJ's RFC determination as to mental ability is supported by substantial evidence in the record.

## V.     CONCLUSION

For the foregoing reasons, the matter is remanded for further proceedings consistent with this order.

**IT IS SO ORDERED.**

**ENTERED: May 21, 2014**

_____
**UNITED STATES MAGISTRATE JUDGE**
**Susan E. Cox**

---

[172] *Id.*
[173] R. at 409–10.
[174] R. at 29.
[175] R. at 27–28.